IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT
IN AND FOR ORANGE COUNTY, STATE OF FLORIDA
CIVIL DIVISION

**SUSAN CALLAGHAN**, individually and
on behalf of all those similarly situated,

        Plaintiff,                      **CLASS REPRESENTATION**

v.                                   Case No.

**TRAVELERS COMMERCIAL
INSURANCE COMPANY,**

        Defendant.

_____/

## CLASS ACTION COMPLAINT AND
## DEMAND FOR JURY TRIAL

Plaintiff, **SUSAN CALLAGHAN** ("Callaghan"), individually, and on behalf of all those

similarly situated, brings this action against Defendant, **TRAVELERS COMMERCIAL**

**INSURANCE COMPANY** ("Travelers"), and alleges as follows:

### Introduction

1.     Travelers insures Callaghan and all its Florida policyholders using a policy of insurance

nominated as Edition 6 of Policy Forms 101 and LP (PL-6000 3-87), as amended by Form PL-

6797 Rev. 12-00 (the "Policy"). The Collision and Comprehensive coverages of the Policy, on

their face, and as amended to conform with Fla. Stat. § 626.9743(5) (if necessary), allow

Travelers to adjust and settle a first-party motor vehicle total loss via a cash payment based upon

the actual cost to purchase a comparable motor vehicle. Such "actual cost" may be derived from

the retail cost as determined from a generally recognized used motor vehicle industry source,

including an electronic database. Fla. Stat. § 626.9743(5)(a)(2).

2.     Travelers purported to adjust and settle Callaghan's total loss in this manner, but it did not do so in reality. Specifically, Travelers used the CCC ONE Market Value system (the "CCC system"), a proprietary electronic database product licensed from CCC Information Services Inc. ("CCC"), to adjust and settle all of its total loss claims in Florida, including Callaghan's.

3.     This violates Florida law and breaches the Collision and Comprehensive coverages of the Policy in three respects. First, the CCC system does not comply with the statutory requirement that an electronic database must seek to provide the "actual cost to purchase a comparable motor vehicle" and its "retail cost," because it uses advertised prices and not sales data. Second, the CCC system is not a "generally recognized used vehicle industry source" as required by the Policy and Florida law. Third, it reflects reductions for depreciation in the amount offered in payment of total loss claims, called "condition adjustments," but those "condition adjustments" are not itemized in specific dollar amounts, do not accurately reflect the values assigned to the depreciation, and such information is not maintained in Travelers' claim files.

4.     To make matters worse, Travelers additionally breaches the Collision and Comprehensive coverages of the Policy and violates Florida law by failing to include in its cash payments the minimum $83.25 in fees charged by the State of Florida in connection with the transfer of title and license to a new vehicle ("title/license fees") and the dealer fees for the costs and profit to the dealer for items such as inspecting, cleaning and adjusting vehicles and preparing documents related to the sale, which fees are required to be disclosed by Fla. Stat. §§ 501.976(11) and 520.02(2) and Fla. Admin. Code § 69V-50.001 and are charged by every used car dealer in Florida (the "dealer fees"). Those fees constitute part of the "actual cost to purchase a comparable motor vehicle" under § 626.9743(5)(a), just like sales tax, and fall within the Policy's definition of "actual cash value," so they must be paid pursuant to the Policy and § 626.9743(5). Travelers refused to pay any title/license fees until at least June 24, 2019, but as a

result of a demand letter sent that date by Callaghan, it now claims that going forward it will pay part of them. Travelers has in the past and still refuses to pay dealer fees pursuant to the Policy.

5.      Even further, Travelers also breaches the Policy by (a) either requiring its total loss policyholders to permanently transfer ownership to it of their total loss vehicles without compensating them for the salvage values of those vehicles or (b) deducting the salvage values of the total loss vehicles from their total loss payments.

6.      Callaghan and the Class are therefore in doubt as to their rights under the Policy with Travelers and seek a declaratory judgment that the Policy does not allow Travelers to adjust and settle total loss claims using the CCC system and that Travelers must pay title/license and dealer fees under the Policy.  In addition, Callaghan and the Class seek a declaratory judgment that Travelers cannot (1) require its insureds to transfer title of their Covered Vehicles to Travelers before it makes payments on their total loss claims; or (2) deduct the salvage values from their insureds' total loss payments if the insureds retain the total loss vehicles.

7.      Additionally, Callaghan and the Class bring a separate breach of contract cause of action for Travelers's failure to pay each of them $83.25 in title/license fees.

8.      Finally, Callaghan and the Class bring a separate breach of contract cause of action to recover the damages they suffered as a result of Travelers taking title to their total loss vehicles or deducting salvage values from their total loss payments.

9.      In conjunction with both their declaratory judgment and breach of contract causes of action, Callaghan and the Class seek to recover the reasonable attorneys' fees and costs required to prosecute them.

## Jurisdiction, Parties, Venue

10. This is an action asserting class claims for declaratory relief and damages pursuant to Florida Rule of Civil Procedure 1.220(b)(1)(A), (2) and/or (3).

11. This Court has jurisdiction because Callaghan seeks declaratory relief and because the amount in controversy exceeds $15,000, exclusive of interest, costs, and attorneys' fees.

12. Currently, Callaghan does not have evidence to support that the amount in controversy exceeds $5,000,000.

13. Plaintiff Susan Callaghan is, and at all material times has been, a resident of Florida and insured by Travelers.

14. At all times material hereto, Travelers was in the business of selling automobile insurance and adjusting and settling automobile insurance claims, including the sale of Collision and Comprehensive coverages and adjustment and payment of first-party total loss claims under those coverages, in Florida. Travelers may be served with process through its registered agent for the service of process in Florida, Jimmy Patronis, the Chief Financial Officer of the Florida Department of Financial Services at 200 E Gaines St, Tallahassee, FL 32399.

15. Venue is proper in Orange County, Florida, because Travelers is a Foreign Profit Corporation, and it has offices for the transaction of, and agents transacting, its customary business in Orange County.

16. All conditions precedent to the maintenance of this action have occurred, have been performed, have been waived, or Travelers is estopped from asserting them, including, but not limited to the following Policy provisions to the extent they constitute conditions precedent to maintaining this action: Duties After an Accident or Loss and Legal Action Against Us.

## Facts Common to Callaghan and the Class

17. The Policy provides, in pertinent part, as follows:

## DAMAGE TO YOUR AUTO

### INSURING AGREEMENT

A. **Collision and Comprehensive (Other than Collision).**   We will pay for direct or accidental loss to "your covered auto" or any "non-owned auto", including their equipment.   We will pay for such loss to "your covered auto" minus any applicable deductible shown in the Declarations.   We will pay for loss to "your covered auto" caused by:

    1. "Collision" only if the Declarations indicate that Coverage E - Collision is provided for that auto.

    2. Other than "collision" only if the Declarations indicate that Coverage F – Comprehensive is provided for that auto.

. . .

**B.**

**C.**

D. **"Collision"** means the upset of "your covered auto" or a "non-owned auto" or their impact with another vehicle or object.   Loss caused by the following is considered other than "collision":

. . .

    2. Fire;

    3. Theft or larceny;

    4. Explosion or earthquake;

. . .

### LIMIT OF LIABILITY

A. Our limit of liability for loss will be the lesser of the:

    1. Actual cash value of the stolen or damaged property; or

    2. Amount necessary to repair or replace the property with like kind and quality.

. . .

B. An adjustment for depreciation and physical condition will be made in determining actual cash value at the time of loss.

. . .

### PAYMENT OF LOSS

We may pay for loss in money or repair or replace the damaged stolen property.

. . .

18.    Callaghan's Declarations indicate that the Covered Auto's coverage included Coverage E – Collision and Coverage F – Comprehensive.  The same is true of all other Class members.  A copy of Callaghan's Declarations is attached hereto as Exhibit A.

19.    Pursuant to the Limits of Liability for the Collison and Comprehensive coverages of the Policy and Fla. Stat. § 319.30, Travelers has the right when presented with a claim for damages to a vehicle where the cost to repair would be greater than its actual cash value to declare the vehicle a total loss and pay the lesser actual cash value in cash.  Of course, when a vehicle is stolen, it is a total loss under the Comprehensive coverage, and Travelers must pay the actual cash value in cash.

20.    When Travelers declares a vehicle a total loss, it must pay its insureds the vehicle's actual cash value as defined in and pursuant to Fla. Stat. § 626.9743, because to the extent that the Policy on its face is in any way inconsistent with that statute, Florida law compels that it be amended to conform to the statute. Thus, if Travelers elects to make a cash payment, as it did on Callaghan's claim and does with all total losses suffered by its Florida policyholders, it must pay "the actual cost to purchase a comparable motor vehicle, including sales tax," which "cost may be derived from: … [t]he retail cost as determined from a generally recognized used motor vehicle industry source such as: … [a]n electronic database…" Fla. Sta. § 626.9743(5)(a)(2)(a). This cash payment is independent of what the policyholder ends up spending, if anything.  In fact, the policyholder may simply keep the cash payment and never replace the total loss vehicle. The Policy is not inconsistent with the statute as to what Travelers must pay, because it provides that Travelers will pay the "actual cash value" of the total loss vehicle, which Florida common law defines as replacement cost of the auto less depreciation.

21.     Travelers used the CCC system to determine the actual cash value of Callaghan's vehicle as it does with all its Florida automobile insurance policyholders who suffer a total loss. The CCC system has the capability to provide a variety of methods for calculating total loss vehicle values which can be chosen by its licensees, here Travelers. Accordingly, in this Complaint, "CCC system" refers to the version of this service used by Travelers.

22.     The CCC system provides total loss valuations automatically based on supposedly comparable vehicle data contained in its computer system and data on the insured's total loss vehicle entered into it by Travelers's adjusters through a computer interface. Among that data entered into the CCC system are the total loss vehicle's Vehicle Identification Number ("VIN"), which provides the vehicle make, model, configuration (e.g., number of doors, engine size, equipment and options), as well as the mileage and license plate number.

23.     The CCC system starts by automatically calculating a "Base Vehicle Value" for the total loss vehicle, as described below, which it adjusts based on the condition of the total loss vehicle. Specifically, Travelers's adjusters rate the condition of twelve components (seats, carpets, dashboard, headliner, sheet metal, trim, paint, glass, engine, transmission, front tires, and rear tires) of the total loss vehicle as "Below Average," "Private Owner," or "Dealer Ready" with the goal of adjusting the value of the total loss vehicle to the value of the same vehicle in "Private Owner" condition. If a component is rated "Below Average," it results in a downward adjustment to the vehicle's "Base Vehicle Value." If a component is rated "Private Owner," no adjustment is made. And, if a component is rated "Dealer Ready," it results in an upward adjustment to the total loss vehicle's "Base Value." Effectively, then, the baseline condition used for total loss vehicles is "Private Owner" condition. The result of taking the "Base Vehicle Value" and making these "total loss vehicle component condition adjustments" is called the "Adjusted Vehicle Value." To the "Adjusted Vehicle Value" sales tax (calculated as a percentage

of the "Adjusted Vehicle Value") is added, resulting in the "Value before Deductible." Travelers pays the "Value before Deductible" less the applicable deductible, resulting in the "Total."

24.     The "Base Vehicle Value" is derived by searching the prices advertised by dealers on websites like Autotrader.com, Truecar and dealer websites for anywhere from three to twelve (but typically nine to twelve) "comparable vehicles" located as close as possible to the insured's residence, adjusting the advertised prices up or down based on mileage, optional equipment and a "Uniform Condition Adjustment" (see below) and then calculating a weighted average of the adjusted prices. According to CCC, the weighting is based on four factors (i) "source of the data (such as inspected versus advertised), (ii) similarity (such as equipment, mileage, and year), (iii) proximity to the loss vehicle's primary garage location, and (iv) recency of information." Upon information and belief, the CCC system omits some of the highest priced comparable vehicles in the area in order to decrease the "Base Vehicle Value."

25.     The supposed purpose of the "Uniform Condition Adjustment" to the "Base Vehicle Value" is to adjust the comparable vehicles to the "Private Owner" condition which is used as the baseline condition for the total loss vehicle. To do this, the CCC system assumes all of the "comparable vehicles" being offered for sale via a retail advertisement have an overall condition of "Dealer Ready" and it makes a uniform downward price adjustment to all of them to supposedly find their values if they were only in "Private Owner" condition like the total loss vehicle after adjustments. This assumption that all of the "comparable vehicles" are in "Dealer Ready" condition is unwarranted, because CCC personnel typically inspect zero to three of the "comparable vehicles" used in a valuation, so they have no actual knowledge of the conditions of virtually all of the "comparable vehicles."

26.     The CCC system's methodology is different from that of the two most well-known sources of used car values that are generally recognized in the used motor vehicle industry,

NADA and KBB.  The NADA and KBB databases use actual sales data, not "adjusted" advertised prices, from a multi-state region.  They each provide a "retail clean" or "dealer" value, which would be the appropriate value to use given that Fla. Stat. § 626.9743(5)(a)(2) requires actual cash value to be based on the retail cost. Travelers' claims adjusters could in every case, including Callaghan's case here, obtain the NADA retail clean value contemporaneous to the date of loss through NADA's free online database, but Travelers chooses not to do so based upon the uniform, pre-determined company policy to exclusively use the CCC system. Significantly, NADA offers subscribers to its electronic database the ability to obtain retail clean values at any specific dates in the past ten (10) years.

27.    The CCC system generates a CCC ONE Market Valuation Report ("CCC Report") setting forth the CCC system valuation which Travelers provides to its total loss policyholders. This report is retained in Travelers's electronic claims records.  Despite having the ability to value total loss claims using the NADA electronic database, Travelers uniformly refuses to do so.  In fact, upon information and belief, Travelers refused to negotiate the "Base Vehicle Value" calculated by the CCC system.

28.    The CCC system does not comply with Fla. Stat. § 626.9743(5)(a)(2)(a) and, thus, breaches the Collision and Comprehensive coverages of the Policy for three major reasons. First, the CCC system is not based upon the "actual cost to purchase a comparable motor vehicle" or "retail cost" because it uses adjusted advertised prices and not actual sales data.  The plain meaning of the word "cost" requires use of sales data. Second, it is not "a generally recognized used motor vehicle industry source" for the "retail cost" of used motor vehicles. Indeed, the CCC system is not available to Callaghan as a consumer, and it is not marketed to the used motor vehicle industry—car dealers and brokers.  Rather, CCC focuses on selling the CCC system as a subscription service to insurance companies, which are not part of the used motor vehicle

industry. And, indeed, insurance companies are virtually the only entities which use the CCC system. Third, the "Uniform Condition Adjustments" constitute a reduction for depreciation in the amount offered in payment of total loss claims, but those "Uniform Condition Adjustments" are not itemized in specific dollar amount, do not accurately reflect the values assigned to the depreciation, and such information is not maintained in Travelers' claim files.

29.     While Travelers may try to argue otherwise, the CCC system is also not designed to and does not comply with Fla. Stat. § 626.9743(5)(a)(1). When that provision states that "the actual cost to purchase a comparable motor vehicle… may be derived from:…the cost of two or more such comparable vehicles available within the preceding 90 days" (if "comparable motor vehicles are available in the local market area"), it means the actual cost of buying the vehicles, which could only be determined by the actual sales prices of such vehicles. This provision does not provide for use of an electronic database or system at all, much less one that does not use sales prices but rather mere advertised prices subject to automated deductions.

30.     Further, despite any Travelers claim to the contrary, the CCC system is not designed to and does not comply with Fla. Stat. § 626.9743(5)(a)(3). It does not obtain "quotes" from dealers—the actual prices for which they commit to sell the cars. Rather, it takes advertised prices and makes illegitimate "Uniform Condition Adjustments" to those advertised prices, as requested by Travelers.

31.     Additionally, the CCC system does not comply with Fla. Stat. § 626.9743(5)(c) for two reasons. First, it clearly attempts to fall under § 626.9743(5)(a)(2)(a), and a failed attempt to do that cannot satisfy § 626.9743(5)(c) as a "basis that varies from the methods described in paragraph (a) or paragraph (b)." Second, that section requires that "the determination of value must be supported by documentation, and any deductions from value must be itemized and specified in appropriate dollar amounts." Travelers does not itemize what comprises the

Uniform Condition Adjustment and specify a dollar amount for each part, and it has no documentation to support that the mileage deductions to the comparable vehicles and the "Uniform Condition Adjustments" to all comparable vehicles (both "deductions from value") are "in appropriate dollar amounts." Those deductions are calculated automatically by the CCC system based on data in the CCC system and proprietary CCC algorithms, and Travelers has no documentation in its possession to show their calculation or appropriateness.

32.     Fla. Stat. § 626.9743(6) provides as follows:

> (6) When the amount offered in settlement reflects a reduction by the insurer because of betterment or depreciation, information pertaining to the reduction shall be maintained with the insurer's claim file. Deductions shall be itemized and specific as to dollar amount and shall accurately reflect the value assigned to the betterment or depreciation. The basis for any deduction shall be explained to the claimant in writing, if requested, and a copy of the explanation shall be maintained with the insurer's claim file.

33.     Because the Uniform Condition Adjustments purportedly reflect the difference in value between the "Dealer Ready" comparable vehicles and the "Normal Wear" conditions of the total loss vehicles and they reduce the values of the comparable vehicles averaged together to calculate the "Base Vehicle Value," they constitute a "reduction by the insurer because of … depreciation" to the total loss vehicles, given the Policy's explanation of "an adjustment for depreciation." Thus, § 626.9743(6) requires Travelers to maintain in each insured's claim file information showing the basis for and calculation of the Uniform Condition Adjustments in accurate amounts. Travelers does not do so, as those deductions are calculated automatically by the CCC system based on data in the CCC system and proprietary CCC algorithms.

34.     Finally, Callaghan and the other members of the Class did not agree on another method with Travelers to value their vehicles. Thus, the CCC system is not designed to, and did not, comply with § 626.9743(5)(d).

35.    In Florida, the "actual cost to purchase a comparable vehicle" and its "retail cost" (as required by the statute) and the "actual cash value" of the total loss vehicle (as required by the Policy) necessarily include numerous fees, including title/license fees and sales tax, because the State of Florida requires a dealer to collect those amounts in connection with the sale and registration of a used motor vehicle. While Travelers pays sales tax, it does not pay the minimum $83.25 in title/license fees that it could reasonably expect its policyholders to incur in connection with the purchase of a replacement vehicle: a $75.25 transfer of title, no lien fee; a $4.50 registration transfer fee; a $2.50 registration service charge fee; and the $1.00 air pollution control fee. The "actual cost to purchase a comparable vehicle" also includes dealer fees, because no used car dealer in the State of Florida will sell a vehicle without charging such dealer fees. The Policy, on its face and as amended to conform to Fla. Stat. § 626.9743(5) (if necessary), requires those fees to be included in a cash payment on the basis of actual cash value.

36.    Moreover, even though a vehicle has been declared a total loss, it still has some monetary (salvage) value, which value is not tied to the loss or actual cash value under the Policy. During the total loss settlement process, purportedly relying on Policy terms and its contractual relationship with its insureds, Travelers required its insureds, including Callaghan and Class members, to transfer ownership and possession of their totaled vehicles to it before it would make payment on their total loss claims. It did so without providing them any form of monetary consideration for the salvage values of their vehicles. Alternatively, if Class members retained their salvage vehicles and either sold the vehicles themselves or continued to use them (if still drivable), Travelers deducted the salvage values from the total loss payments made to those Class members. Either way, Travelers took the salvage values of the total loss vehicles.

37.    Travelers takes the total loss vehicles' salvage values even though no provision in the Policy (a) requires insureds to permanently transfer titles of their total loss vehicles to Travelers

in order to receive payment for their total loss vehicles; or (b) provides for a deduction of salvage value from actual cash value payments of total loss claims. In the absence of such provisions, Travelers's taking of Callaghan's and the Class's salvage values constitutes a breach of the Collision and Comprehensive coverages of the Policy, because it reduces their total loss recoveries to less than the actual cash value required under the Policy.

## Facts as to Travelers's Treatment of Callaghan

38.     On or about October 5, 2018, Callaghan's vehicle ("Covered Vehicle"), a 2016 Ford Fiesta SE 4D, suffered a catastrophic transmission failure which rendered the vehicle a total loss. At that time, Callaghan was a contracting party and named insured under the Policy issued by Travelers, which was in full force and effect.

39.     Immediately, on the same day of October 5, 2018, Callaghan made a claim with Travelers for payment on her Covered Vehicle. On or about October 9, 2018, Travelers affirmed Comprehensive coverage for the Covered Vehicle as a total loss. On that same date, it sent her a CCC Report claiming an "Adjusted Vehicle Value" of the Covered Vehicle of $8,573.00. This value represented a "Base Vehicle Value" of $9,946, minus a "condition adjustment" of -$128 for the condition of the Covered Vehicle and -$1,245 for the damaged transmission.  The CCC system calculated the "Base Vehicle Value" of $9,946 by averaging the adjusted prices of twelve "comparable vehicles," only two of which CCC claimed to have inspected.  The advertised prices of the "comparable vehicles" ranged from a low of $7,800 to a high of $11,995. Despite this huge variance in advertised price, the CCC system applied a "Uniform Condition Adjustment" of -$525.00 to all twelve "comparable vehicles" used to calculate the "Base Vehicle Value." A copy of the CCC Report is attached hereto as Exhibit B.

40.     Consistent with its policy described above, Travelers required Callaghan to sign over the title of her Covered Vehicle to Travelers before Travelers would pay the total loss payment.

41.    Travelers sent Callaghan a check for $8,887.38 on October 16, 2018.  Neither the check, nor the corresponding stub, nor the CCC Report included an adjustment for or offered to pay dealer or title/license fees. A copy of the October 16, 2018 check and stub is attached hereto as Exhibit C. Callaghan does not claim that Travelers undervalued her Covered Vehicle, but rather only that it used an invalid method, the CCC system, to do so. She does not know whether Travelers using a method that complies with the Policy and § 626.9743(5) (of which there several) to re-value her Covered Vehicle would result in an increased valuation. Of course, regardless of the valuation, Callaghan claims Travelers should have paid her title/license fees and dealer fees.

42.    On June 24, 2019, on behalf of herself and all similarly situated Travelers Florida automobile policyholders, Callaghan served Travelers with a letter demanding that within fourteen days Travelers review and respond to her letter demanding compliance with the terms of the Policy and Fla. Stat. § 626.9743, including payment of the $83.25 in title/license fees to her and all its similarly situated Florida policyholders. A copy of the June 24, 2019 coverage demand letter is attached hereto as Exhibit D.

43.    On that same day, June 24, 2019, a Travelers adjuster called Callaghan despite knowing that she was represented by counsel. Callaghan told the adjuster that she would not talk to Travelers and that the adjuster should call her counsel.  Travelers then mailed a letter to Callaghan at a 12-year-old address in New Jersey (copying Callaghan's counsel by email), despite having insured Callaghan in Florida and having her correct Florida address in its records. The letter stated that Travelers "is issuing a payment for a title and/or transfer and license plate transfer fees that were not paid to you at the time of your loss, plus interest." Specifically, Travelers stated it would pay the $4.50 registration transfer fee (which it mistakenly called a "License plate fee") and the $75.25 transfer of title, no lien fee (which it called a "Title and/or

transfer fee"), plus $4.25 in interest on those amounts. Under Florida law, this constituted a confession of judgment that Travelers owes these amounts as part of the actual cash value of a total loss vehicle and that it must go back and pay those amounts to policyholders who were not paid them, plus interest. The confession letter did not state that Travelers would pay the $2.50 registration service charge fee and the $1.00 air pollution control fee.   A copy of Travelers's June 24, 2019 confession letter is attached hereto as Exhibit E. If Travelers ever sent the promised payment, it presumably mailed it to the long obsolete New Jersey address. To date, Callaghan has never received any such payment from Travelers.

44.     On July 8, 2019, counsel for Travelers sent a letter to counsel for Callaghan further responding to the June 24, 2019 coverage demand letter. As regards the $4.50 registration transfer fee and the $75.25 transfer of title, no lien fee, Travelers wrote "the company has, pursuant to a change in company policy, committed to pay for the license and title fees at issue, despite the company's continued position that it has no legal obligation to do so, and has previously sent your clients a letter, attached hereto, indicting it is paying these amounts." Despite the disclaimer as to Travelers' supposed lack of legal obligation to pay such fees, under Florida law, this constituted a confession of judgment that Travelers owes these amounts as part of the actual cash value of a total loss vehicle and that it must go back and pay those amounts to policyholders who were not paid them, plus interest. The letter went on to claim that the $2.50 registration service charge fee and the $1.00 air pollution control fee are not covered by the Policy. A copy of the July 8, 2019 letter is attached hereto as Exhibit F.

45.     In the letter, Travelers maintained that its use of the CCC system to calculate the actual cash values of Callaghan's and the other Class members' cars met the requirements of Florida law and the Policy. Travelers additionally maintained that Florida law and the Policy did not require it to pay Callaghan and the Class the dealer fees it could reasonably anticipate they would

incur.

46.     Callaghan and the Class are in doubt of their rights as to whether their vehicles were valued with a method that complied with Fla. Stat. § 626.9743(5) and the Policy.

47.     Callaghan and the Class are further in doubt of their rights as to whether Fla. Stat. § 626.9743(5) and the Policy require payment of dealer fees and title/license fees by Travelers. Even as to the portion of the title/license fees that Travelers claims it will now pay, Callagahn and the Class are still in doubt of their rights in connection with their past claims because Travelers has never actually delivered a check to Callaghan and has never said it would pay those amounts on past claims to anybody other than Callaghan. And those members of the Class still insured by Travelers are in doubt as to their future rights under the Policy, because Travelers denies the Policy or Florida law requires payment of these fees and company policy can always be changed back (if indeed it has really been changed).

48.     Callaghan and the Class are further in doubt of their rights as to whether the Policy allows Travelers to require its insureds to transfer title of their Covered Vehicles to Travelers before it makes payments on their total loss claims or deduct the salvage values from their insureds' total loss payments because the insured retained their total loss vehicles.

49.     Many members of the Class are still insured by Travelers and they can reasonably expect that they may suffer additional total losses in the future and they are in doubt as to their rights in that event.

### Class Action Allegations

50.     Pursuant to Florida Rule of Civil Procedure 1.220(b)(1)(A), (2) & (3), Callaghan brings Count I of this action for declaratory judgment on her own behalf and on behalf of the Class defined below. Pursuant to Rule 1.220(b)(1)(A) & (3), she brings Counts II and III for breach of contract on her own behalf and on behalf of the Class defined below.

51.   The Class consists of and is defined as all individuals who: (a) on or after the date five years before this Complaint is filed; (b) are or were covered by a Travelers Florida personal automobile insurance policy; (c) made a claim under the Collision or Comprehensive coverage of that policy for damage or loss to a covered vehicle which Travelers accepted and treated as a total loss claim; and (d) Travelers paid the claim or offered to pay the claim (which offer remains unaccepted) on a cash payment basis with the actual cash value derived from the CCC system (hereafter the "Class"). The class period will be from five years before the date this Complaint is filed to the date of class certification (hereinafter the "Class Period").

52.   Callaghan reserves the right to amend the Class and/or add sub-class definitions as discovery proceeds and to conform to the evidence.

53.   While the exact number of Class members is unknown at this time, Callaghan submits, based upon her counsel's representation of automobile accident victims in Florida, that there are at least a hundred Travelers policyholders spread throughout the State of Florida who are potential Class members in this action.  Accordingly, separate joinder of all Class members would be impracticable.

54.   This action poses questions of law and fact that are common to and affect the rights of all members of the Class. Such questions of law and fact common to the Class include, but are not limited to, the following:

   a.  Whether Travelers's use of the CCC system to adjust and settle first-party motor vehicle total loss claims breaches the Policy and violates Florida law?

   b.  Whether Travelers's refusal to pay dealer fees breaches the Policy and violates Florida law?

   c.  Whether Travelers's refusal to pay title/license fees breaches the Policy and violates Florida law?

d.  Whether Callaghan and the other Class members were damaged in the amount of the title/license fees Travelers refused to pay?

e.  Whether Callaghan and the other Class members are entitled to a declaration of their rights under the Policy and Florida law?

f.  Whether the Policy clearly and unambiguously permits Travelers to take the salvage values of its insureds' total loss vehicles by either (a) requiring them to transfer title and possession of the total loss vehicles to Travelers without compensating them for the salvage values of the vehicles or (b) deducting the salvage values from their total loss payments?

g.  Whether Travelers breached the Policy as to Callaghan and the Class by taking their salvage values, entitling them to recover from Travelers the amounts for which Travelers sold their total loss vehicles or the amounts Travelers deducted from their total loss payments for "salvage value," as the case may be? and

h.  Whether Callaghan and the other Class members are entitled to recover reasonable attorneys' fees and costs in connection with the successful prosecution of their declaratory judgment and/or breach of contract causes of action?

55.    Callaghan's claims are typical of the claims of the other members of the Class, because they all arise out of the exact same policies and practices of Travelers and under the exact same theories of law.

56.    Callaghan will adequately represent the Class, because she and the undersigned counsel she has retained have no conflicts of interest with the other Class members, she is ready, willing and able to represent the Class, and the undersigned retained attorneys are very experienced class action practitioners with extensive experience in prosecuting class actions against automobile insurers.

57.     Callaghan and the Class's declaratory judgment and breach of contract causes of action may be maintained as a class action pursuant to Rule 1.220(b)(1)(A), because the prosecution of separate claims by individual Class members would create a risk of inconsistent or varying adjudications concerning individual members of the Class which would establish incompatible standards of conduct for Travelers. For example, the court in one case might rule that Travelers must pay dealer fees while another might rule that it does not have to do so. Travelers would be left in an untenable legal limbo in such an event, because it must necessarily interpret a form policy the same for all its customers insured under such policy.

58.     Callaghan's declaratory judgment cause of action may also be maintained as a class action pursuant to Rule 1.220(b)(2), because Travelers has acted and refused to act on grounds generally applicable to all members of the Class, thereby making final declaratory relief concerning the Class as a whole appropriate. Specifically, Travelers has in the past and will in the future adjust total loss claims the exact same way in breach of the Policy and in violation of Florida law, making declaratory relief for the Class as to its members' rights under the Policy and Florida law appropriate.

59.     Callaghan's declaratory judgment and breach of contract causes of action may also be maintained as a class action pursuant to Rule 1.220(b)(3), because the questions of law or fact common to Callaghan and the Class predominate over any questions of law or fact affecting only individual Class members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. As demonstrated by paragraph 54 above, all the questions necessary for resolution of Travelers's liability to Callaghan and the Class are common. The only individual issues are the amounts of damages as to the breach of contract causes of action, and they may be calculated on a mechanical, ministerial basis without the need for the trier of fact to individually decide them.

60.     A reasonable assumption for a cash payment is that each Class member will necessarily incur at a minimum a $75.25 transfer of title, without lien fee, a $2.50 title transfer service fee, a $4.50 license plate transfer fee, and a $1.00 air pollution control fee, making all Class members entitled to recover the exact same $83.25 for Travelers's refusal to pay title/license registration fees, as a matter of law.  Also, the damages to Callaghan and all of the other Class members from Travelers taking the salvage values of the total loss vehicles are the amounts for which Travelers sold their total loss vehicles (if ownership was transferred to Travelers) or the amount Travelers deducted for salvage value from their total loss payments.  Such information is readily available in Travelers's electronic records.

61.     A class action is superior to other methods for the adjudication of these issues because the amounts recoverable by individual Class members are not sufficient to justify individual suits against a large corporation like Travelers which can be expected to vigorously defend every such suit as a matter of precedent. For that reason, Class members do not have a real interest in individually controlling their separate claims.  Further, the overwhelming majority of Class members do not even know they have such claims to sue over.  This is demonstrated by the fact that there do not appear be any pending individual suits against Travelers in Florida over these issues. Simply put, there are no alternatives to a class action to resolve this controversy.

62.     Even if individual suits were feasible and likely to be filed, it would be highly inefficient and a waste of the parties' and the court system's resources to repeatedly adjudicate the same factual and legal issues.  Plus, it could result in undesirable inconsistent adjudications as set forth above.  Thus, it is highly desirable to concentrate the litigation in this forum, which is well equipped to resolve the controversy for all Class members and Travelers.

63.     There are no unusual difficulties likely to be encountered in the management of this case as a class action.  Florida law applies to all Class members' claims, and the legal issues are

simple matters of statutory and contractual interpretation. All Class members are readily ascertainable from Travelers's records, including physical addresses and email addresses (in most cases), making the provision of notice routine. And, as previously explained, damages are easily and readily calculable for each Class member on a mechanical, ministerial basis.

### Count I – Cause of Action for Declaratory Judgment and Supplemental Relief

64.    Callaghan and the Class re-allege and incorporate by reference Paragraphs 1-63 above as if fully set forth here verbatim.

65.    This Count is an action for declaratory judgment and supplemental relief pursuant to Chapter 86, Florida Statutes.

66.    A controversy exists presently between Callaghan, the Class, and Travelers as to (a) whether Travelers uses a vehicle valuation method that complies with Florida law and the Policy's Collison/Comprehensive coverages; (b) whether the Policy's Collison/Comprehensive coverages require payment of dealer fees and title/license fees; and (c) whether the Policy allows Travelers to take the salvage values of total loss vehicles.

67.    Callaghan and the Class are in doubt concerning their rights under the Policy's Collison/Comprehensive Coverages, and bona fide present controversies exist between Callaghan, the Class and Travelers concerning the proper interpretation of the express terms of the Policy issued by Travelers, and other applicable law, and the parties' respective rights and obligations thereunder. In addition, because many members of the Class are still insured by Travelers and could reasonably anticipate suffering another total loss in the future, they are further in doubt about their rights under the Policy.

68.    The rights, status, or other equitable or legal relations of the parties are affected by the express terms of the Policy and applicable law. Accordingly, pursuant to Chapter 86, Florida Statutes, Callaghan and the Class may obtain a declaration of their rights, status, or other

equitable or legal relations thereunder.

69.     Section 86.011, Florida Statutes states that this Court has "jurisdiction … to declare rights, status, and other equitable or legal relations whether or not further relief is or could be claimed."

70.     Section 86.111, Florida Statutes states, "The existence of another adequate remedy does not preclude a judgment for declaratory relief." Thus, regardless of whether damages are available to Callaghan and the Class, this Court still has jurisdiction to determine the parties' respective rights, status, and other equitable or legal relations under the insurance policy and applicable law.

71.     Section 86.011(2), Florida Statutes states that "The court may render declaratory judgments on the existence, or non-existence … Of any fact upon which the existence or nonexistence of such immunity, power, privilege, or right does or may depend, whether such immunity, power, privilege, or right now exists or will arise in the future." Thus, the Court still has jurisdiction to determine whether Travelers's past conduct has been unlawful in order to prevent the same unlawful conduct in the future.

72.     Section 86.021, Florida Statutes states, "Any person claiming to be interested or who may be in doubt about his or her rights under a … contract, … or whose rights, status, or other equitable or legal relations are affected by a statute … may have determined any question of construction or validity arising under such statute, … contract, … or any part thereof, and obtain a declaration of rights, status, or other equitable or legal relations thereunder." Thus, the Court has jurisdiction to determine the rights of "any person" (such as Callaghan and the Class) who is in doubt about his rights under the Policy and any applicable laws.

73.     Section 86.031, Florida Statutes states, "A contract may be construed either before or after there has been a breach of it." Under this statute, the Court has jurisdiction to determine

whether Travelers has violated the terms of the Policy and applicable law and whether its conduct will violate the Policy and applicable law in the future.

74.     Section 86.051, Florida Statutes states, "Any declaratory judgment rendered pursuant to this chapter may be rendered by way of anticipation with respect to any act not yet done or any event which has not yet happened, and in such case the judgment shall have the same binding effect with respect to that future act or event, and the rights or liability to arise therefrom, as if that act or event had already been done or had already happened before the judgment was rendered." This statute confirms that the Court has jurisdiction to determine the legality of the Travelers's past conduct in order to gauge its anticipated future conduct and to prevent unlawful conduct in the future.

75.     Section 86.071, Florida Statutes states, in pertinent part, that when a declaratory action "concerns the determination of an issue of fact, the issue may be tried as issues of fact are tried in other civil actions in the court in which the proceeding is pending. To settle questions of fact necessary to be determined before judgment can be rendered, the court may direct their submission to a jury." Thus, the existence of disputed fact issues does not prevent the Court from providing declaratory relief under Chapter 86.

76.     Section 86.061, Florida Statutes provides, in pertinent part, the Court may grant further or supplemental relief based on a declaratory judgment.

77.     A determination of the rights of Callaghan and the Class under the Policy and law regarding the Policy's Collision/Comprehensive coverage for the underlying total loss claims will terminate the controversies specified in the previous paragraphs.

78.     Callaghan and the Class now petition this Court for a declaration that Travelers's use of the CCC System is an invalid method of valuing vehicles under Fla. Stat. § 626.9743(5) and the Policy.

79.    Callaghan and the Class additionally petition this Court for a declaration that Fla. Stat. § 626.9743(5) and the Policy require payment of dealer fees and title/license fees as part as part of a total loss payment. They also seek further or supplemental relief in the form of an order requiring Travelers to pay Callaghan and each member of the Class $83.25 for title/license fees.

80.    Callaghan and the Class additionally petition this Court for a declaration that the Policy does not grant Travelers the right to take the salvage values of their total loss vehicles such that doing so breaches the Policy. They also seek further or supplemental relief in the form of an order requiring Travelers to pay them the salvage values of their total loss vehicles.

81.    Pursuant to Fla. Stat. § 627.428, Callaghan and the Class are entitled to recover their reasonable attorneys' fees and costs incurred in prosecuting this cause of action.

### Count II – Cause of Action for Breach of Contract Based on License/Title Fees

82.    Callaghan and the Class re-allege and incorporate by reference Paragraphs 1-63 above.

83.    The Policy constituted binding contacts between Travelers and Callaghan and the other Class members. Under Florida law, to the extent the Policy's express terms regarding the adjustment and payment of first-party motor vehicle total losses on the basis of actual cash value vary from the provisions of Fla. Stat. § 626.9743(5)(a), it is deemed amended to conform with that statute.

84.    As explained above, by refusing to pay Callaghan and the Class $83.25 in license/transfer fees owed to them under Florida law, Travelers breached the Policy. Such breach proximately injured Callaghan and each Class member in the aforementioned amount.

85.    Pursuant to Fla. Stat. § 627.428, Callaghan and the Class are entitled to recover their reasonable attorneys' fees and costs incurred in prosecuting this cause of action.

### Count III-Cause of Action for Breach of Contract for Taking Salvage Values

86.    Callaghan and the Class re-allege and incorporate by reference Paragraphs 1-63 above.

87.     The Policy constituted binding contacts between Travelers and Callaghan and the other Class members. Pursuant to Florida law, to the extent the Policy's express terms regarding the adjustment and settlement of first-party motor vehicle total losses on the basis of actual cash value vary from the provisions of Fla. Stat. § 626.9743(5) & (6), they are deemed amended to conform with that statute.

88.     As explained above, by taking the salvage values of Callaghan's and the Class' total loss vehicles, Travelers breached the Collision and Comprehensive coverages of the Policy, because it reduced their total loss recoveries to less than the actual cash value required under the Policy. Such breach proximately injured Callaghan and all the other Class members in the amounts for which Travelers sold their total loss vehicles (if ownership was transferred to Travelers) or the amounts deducted by Travelers for "salvage" from their total loss payments.

89.     Pursuant to Fla. Stat. § 627.428, Callaghan and the Class are entitled to recover their reasonable attorneys' fees and costs incurred in prosecuting this cause of action.

### REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff Susan Callaghan and the Class respectfully request the Court to

award them the following relief against Travelers:

a.     Issue an order certifying that this action is properly maintainable as a class action under Rule 1.220(b)(1)(a), (2) and/or (3) and appointing Callaghan to represent the Class defined herein;

b.     Issue an order appointing the undersigned law firms as class counsel;

c.     Grant a judgment pursuant to Count I against Travelers to Callaghan and the other members of the Class declaring the parties' respective rights and obligations under the Policy and Florida law and ordering further or supplemental relief as set forth above;

d.      Grant a judgment pursuant to Count II against Travelers awarding Callaghan and the other members of the Class damages for breach of contract as set forth above;

e.      Grant a judgment pursuant to Count III against Travelers awarding Callaghan and the other members of the Class damages for breach of contract as set forth above;

f.      Grant a judgment against Travelers pursuant to Counts I, II, and/or III awarding Callaghan and the Class their reasonable attorneys' fees and costs incurred in this action pursuant to Fla. Stat. § 627.428;

g.      Grant a judgment pursuant to Counts II and/or III against Travelers awarding Callaghan and the Class pre-judgment and post-judgment interest at the maximum rates permissible at law or in equity; and

h.      Grant a judgment against Travelers awarding Callaghan and the Class all such other and further relief, general or special, legal or equitable, to which they may be justly entitled.

### Demand for Jury Trial

Callaghan and the Class hereby demand a trial by jury on all the issues so triable.

Respectfully Submitted,

/s/Scott R. Jeeves
Scott R. Jeeves, Esquire FBN 0905630
Primary Email: sjeeves@jeeveslawgroup.com
Secondary Email: khill@jeeveslawgroup.com
                 lawclerk@jeeveslawgroup.com
rmandel@jeevesmandellawgroup.com
**THE JEEVES LAW GROUP, P.A.**
954 First Avenue North
St. Petersburg, FL 33705
Telephone: (727) 894-2929

and

Craig E. Rothburd, Esquire FBN 49182
Email: crothburd@e-rlaw.com
**CRAIG E. ROTHBURD, P.A.**
320 W. Kennedy Blvd., Suite 700
Tampa, FL 33606

Telephone: (813) 251-8800

and

Casim Adam Neff, Esquire FBN 94030
**Neff Insurance Law, PLLC**

P.O. Box 15063
St. Petersburg, FL 33733-5063
Telephone: (727) 342-0617
Primary: cneff@neffinsurancelaw.com

and

Edward H. Zebersky, Esq. FBN 0908370
Mark S. Fistos, Esq. FBN 909191
**ZEBERSKY PAYNE, LLP**
110 S.E. 6th Street, Suite 210
Ft. Lauderdale, FL 33301
Telephone: (954) 989-6333
Emails: ezebersky@zpllp.com;
mfistos@zpllp.com; ndiez@zpllp.com

and

Alec H. Schultz, Esq. FEN 35022
Carly A. Kligler, Esq. FBN 83990
**LEÓN COSGROVE, LLP**
255 Alhambra Circle, Suite 800
Coral Gables, FL 33134
Telephone: (305) 740-1975
Primary: ashultz@leoncosgrove.com;
ckligler@leoncosgrove.com

and

Arthur M. Murray, (La. Bar # 27694)
*(to appear pro hac vice)*
**MURRAY LAW FIRM**
Suite 2150 Poydras Center
650 Poydras Street
New Orleans, Louisiana 70130
Telephone: (504) 525-8100
Facsimile: (504) 584-5249
Email: amurray@murray-lawfirm.com

**ATTORNEYS FOR PLAINTIFF SUSAN
CALLAGHAN AND THE CLASS**