**UNITED STATES DISTRICT COURT FOR THE**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

SUSAN CALLAGHAN, individually and on
behalf of all others similarly situated,

    Plaintiff,                                 Case No. 6:19-cv-01633-Orl-78LRH

vs.

TRAVELERS COMMERCIAL INSURANCE
COMPANY,

    Defendant.

_____/

## DEFENDANT'S MOTION TO DISMISS AND ACCOMPANYING MEMORANDUM OF LAW

Defendant, Travelers Commercial Insurance Company ("Defendant"), respectfully requests the Court to enter an order dismissing Plaintiff's Complaint.  The grounds for Defendant's Motion are fully set forth in the accompanying Memorandum of Law.

## MEMORANDUM OF LAW

### Allegations of Complaint

Plaintiff alleges she is an insured under an automobile policy issued by Defendant which provides coverage for actual cash value ("ACV") in the event of a total loss.  (Compl., ¶¶ 13, 20.)  Plaintiff alleges that when Defendant adjusts total loss claims it uses the CCC system to determine the ACV, which Plaintiff claims results in a violation of Fla. Stat. 626.9743.  (Compl., ¶¶ 21-34.)

Plaintiff further alleges that, under Florida law, actual cash value is defined as replacement cost less depreciation.  (*Id.,* ¶ 20.)  Plaintiff alleges that fees totaling $83.25, for title transfer ($75.25), license plate/registration transfer ($4.50), registration service charge ($2.50) and air pollution control ($1.00), as well as dealer fees, are part of the replacement cost of a total loss vehicle because they are required to be included in an ACV payment, but that Defendant wrongfully failed to pay any amounts for these fees.  (*Id*., ¶¶ 35, 41.)  In addition, Plaintiff alleges that when a vehicle is declared a total loss, it still has salvage value, and that Defendant required Plaintiff to transfer ownership of her totaled vehicle but wrongfully failed to pay any amount for salvage value, and where insureds retained their salvage vehicles Defendant wrongfully deducted amounts for salvage value.  (*Id*., ¶¶ 36-37.)

Plaintiff acknowledges that, before she filed her lawsuit, Defendant advised her that it was issuing payment for the title transfer fee ($75.25) and license plate/registration transfer

fee ($4.50), plus interest on those amounts ($4.25), which Plaintiff claims amounted to a "confession of judgment" that Defendant owes the amounts as part of the ACV.  (*Id.,* ¶¶ 42-44.)  Plaintiff alleges that Defendant sent her a letter on June 24, 2019, and another letter to her counsel on July 8, 2019, advising it was paying the above amounts, but that it owed no coverage for dealer fees or air pollution control fees.  (*Id.,*  ¶¶ 43-45.)

**Plaintiff's Policy**

The insurance policy applicable to Plaintiff's loss ("Policy," a copy of which is attached as Exhibit A hereto),[1] provides, in relevant part:

### INSURING AGREEMENT

**A.  Collision and Comprehensive (Other than Collision)**.  We will pay for direct and accidental loss to "your covered auto" or any "non-owned auto", including their equipment. We will pay for such loss to "your covered auto" minus any applicable deductible shown in the Declarations.  We will pay for loss to "your covered auto" caused by:

1. "Collision" only if the Declarations indicate that Coverage E - Collision is provided for that auto.

2. Other than "collision" only if the Declarations indicate that Coverage F Comprehensive is provided for that auto. * * *

Policy, Endorsement AO9018, p. 3.

### LIMIT OF LIABILITY

B.  Our limit of liability for loss will be the lesser of the:

1. Actual cash value of the stolen or damaged property; or

---

[1] The Court may consider the Policy on a motion to dismiss. *See, e.g., Surgery Ctr. of Viera, LLC v. Se. Surveying & Mapping Corp.*, No. 617CV754ORL40TBS, 2018 WL 922202, at *4 (M.D. Fla. Jan. 31, 2018), *report and recommendation adopted,* No. 617CV754ORL40TBS, 2018 WL 906771 (M.D. Fla. Feb. 15, 2018) ("[W]here the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim, then the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal, and the defendant's attaching such documents to the motion to dismiss will not require conversion of the motion into a motion for summary judgment.") (quoting *Brooks v. Blue Cross and Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997)).

2

2.   Amount necessary to repair or replace the property with like kind and quality.

However, the most we will pay for loss to any "non-owned auto" which is a "trailer" is $500.

C.   An adjustment for depreciation and physical condition will be made in determining actual cash value at the time of loss.

Policy, Endorsement AO9018, p. 6.

## PAYMENT OF LOSS

We may pay for loss in money or repair or replace the damaged or stolen property. We may, at our expense, return any stolen property to:

1.      You; or
2.      The address shown in this policy.

If we return stolen property we will pay for any damage resulting from the theft.  We may keep all or part of the property at an agreed or appraised value.

*Id.*

### APPRAISAL

A.  If we and you do not agree on the amount of loss, either may request an appraisal of the loss.  Upon notice of a request for an appraisal, the opposing party may, prior to appraisal, demand mediation of the dispute in accordance with the Mediation provision contained in the General Provisions of the policy.  If requested, the mediation must be completed before a request for an appraisal can be made.

* * *

*Id.*

## LEGAL ACTION AGAINST US

No legal action may be brought against us until there has been full compliance with all the terms of this policy. . . .

Form PL6000 3-87, p. 11.

## ARGUMENT

### I.   PLAINTIFF'S COMPLAINT SHOULD BE DISMISSED AND SHE SHOULD BE REQUIRED TO PROCEED WITH APPRAISAL.

Appraisal clauses in insurance policies "are valid and binding upon the parties if they are appropriately invoked." *State Farm Fire & Cas. Co. v. Middleton*, 648 So. 2d 1200, 1202 (Fla. 3d DCA 1995) (citing *New Amsterdam Casualty Co. v. J.H. Blackshear, Inc.*, 156 So. 695, 696 (Fla. 1934)). The "general, even overwhelming, preference in Florida for the resolution of conflicts [is] through any extra-judicial means . . . for which the parties have themselves contracted." *Id.* at 1201-02. This principle has "particular applicability" in cases, as here, "in which a great deal of judicial resources which might otherwise be required in resolving the factual and legal issues . . . would be saved at the threshold by a relatively swift and informal decision by the appraisers as to the amount of the loss." *Id.* at 1202. "A motion to compel appraisal should be granted whenever the parties have agreed to appraisal and the court entertains no doubt that such an agreement was made." *Almeria Park Condo. Ass'n, Inc. v. Empire Indem. Ins. Co.*, No. 18-20609-CIV, 2018 WL 8193773, at *3 (S.D. Fla. May 24, 2018) (citation and internal quotations omitted).

Here, the Policy, quoted above, constitutes the parties' agreement to appraisal if requested, and in fact, by letter dated August 21, 2019 (attached hereto as Exhibit B), as well as through this pleading, Defendant has invoked its right to appraisal. Appraisal is appropriate here because Plaintiff clearly disputes the amount she was paid for her claim. In her allegations regarding CCC, Plaintiff claims Defendant improperly used advertised prices as opposed to sales data to value claims. (Compl., ¶¶ 3, 28.) Plaintiff alleges that despite

having the ability to "value total loss claims" using other databases, Defendant uses CCC. (*Id.,* ¶ 27.)  The result, according to Plaintiff, is amounts that "do not accurately reflect the values" for depreciation.  (*Id.,* ¶ 28.)  In addition, Plaintiff alleges Defendant failed to include the aforementioned "title/license" and other fees, as a well as amounts for salvage value, when it adjusted her total loss claim.  (*Id.,* ¶¶ 35-45.)  Since these allegations turn on questions regarding the amount of loss, appraisal is the proper mechanism for resolving Plaintiff's claims.

Moreover, "once [an appraisal] clause is appropriately invoked [appraisal] becomes a condition precedent to the right of the insured to maintain an action on the policy."  *U.S. Fire Ins. Co. v. Franko*, 443 So. 2d 170, 172 (Fla. 1st DCA 1983).  As one court explained, "appraisal provisions contained within an insurance contract are treated as conditions precedent to recovery under the policy."  *Almeria*, 2018 WL 8193773, at *3 (citation and internal quotation omitted).  And, as noted, Plaintiff's Policy requires compliance with the appraisal process as a condition precedent prior to litigating a dispute against Defendant: "No legal action may be brought against us until there has been full compliance with all the terms of this policy. . . ."  Policy, Form PL6000 3-87, p. 11.  Because appraisal is a condition precedent to Plaintiff's right to pursue an action under the Policy against Defendant, her Complaint should be dismissed.  *See, e.g., Moore v. Travelers*, 321 Fed. App'x 911, 913 (11th Cir. 2009) ("under the terms of the homeowners policy, Moore must first comply with the appraisal provision to determine his amount of loss.  He is contractually bound to do so. . . .  As no appraisal has as yet taken place to resolve this matter, Moore's complaint fails to state a claim upon which relief can be granted.").

In fact, applying the above principles, Florida district courts, including in this District, have specifically rejected, in favor of appraisal, lawsuits alleging an insurer improperly used CCC to evaluate claims and failed to pay the same types of fees about which Plaintiff complains here.  The court did so recently in *Bloomgarden v. Allstate Fire & Cas. Ins. Co.*, No. 18-62059-CIV, 2019 WL 2245475, at *1 (S.D. Fla. Mar. 15, 2019) (Seltzer, M. J.), *report and recommendation adopted in part* (Aug. 6, 2019) (Gayles, J.) (adopting Magistrate Judge's recommendation to dismiss substantively similar claims pending appraisal).  There, the plaintiff alleged the CCC method is not a "generally recognized motor vehicle industry source," and the defendant insurer violated Florida law by using it.  Even though the plaintiff complained about the defendant's use of CCC to adjust the claim, Magistrate Judge Seltzer, in a ruling adopted by Judge Gayles, concluded the dispute was over valuation.  As a result, dismissal was warranted because the plaintiff failed to comply with the policy's appraisal requirement.

Similarly, in *Bettor v. Esurance Prop. & Cas. Ins. Co.*, No. 18-61860-CIV, 2019 WL 2245564, at *2–3 (S.D. Fla. Mar. 28, 2019) (Seltzer, M. J.), *report and recommendation adopted* (June 17, 2019) (Moreno, J.), the plaintiff alleged the defendant improperly relied on a total loss valuation database and a CCC ONE Market Valuation Report.  The plaintiff argued "he does not dispute the amount of the deduction taken; he disputes that the deduction may be taken at all.  Thus, he argues the subject of the declaratory judgment action does not fall within the scope of the Policy's appraisal provision."  *Id.,* *2.  Again, Magistrate Judge Seltzer rejected that argument:

> The undersigned disagrees.  This case is, undeniably, about the actual cash value assigned to the vehicle by Esurance.  Bettor asks that the Court "require Defendant to readjust its claims based on a proper methodology permitted under Florida law" [DE 6, p. 17], presumably <u>without</u> the $ 945 deduction.  Furthermore, in Count II, Bettor seeks "monetary damages" resulting from the condition adjustment of his total loss vehicle.  [DE 6, ¶¶ 89-96].  There is no dispute that Esurance paid what it determined to be the actual cash value of Bettor's vehicle, as covered under the Policy.  Bettor expressly acknowledges in his pleading that Esurance "covered the claim." [DE 6, ¶ 48].  Stated simply, this litigation is not about coverage, but about the amount of money owed to Bettor following an unsatisfactory claim adjustment.  Bettor cannot avoid the application of the appraisal provision by the simple expedient of highly technical and internally inconsistent pleading.

*Id.* at *3-4 (further stating "the dispute is, at its core, about the value of Plaintiff's automobile.  It does not matter whether Bettor styles his claim as an action for declaratory judgment or for breach of contract: both claims seek a re-valuation of the vehicle's actual cash value and are, therefore, subject to appraisal.").  Judge Moreno agreed, adopted Magistrate Judge Seltzer's Report and Recommendation and dismissed the case.  *Id.,* ECF 42.

More recently, in *McGowan v. First Acceptance Ins. Co.,* No. 19-cv-01101-SCB (M.D. Fla. Aug. 14, 2019), (copy attached as Exhibit C), *reconsid. denied* (Sept. 4, 2019), Judge Bucklew dismissed a lawsuit with allegations similar to Plaintiff's here, including both the CCC argument and the purported failure to pay certain of the types of fees about which Plaintiff complains.  Specifically, Judge Bucklew stated:  "Plaintiff does not, and cannot, allege that Defendant disputed coverage for Plaintiff's loss inasmuch as Plaintiff acknowledges that Defendant paid his claim.  Instead, Plaintiff disputes the amount he was

paid.  Specifically, Plaintiff contends Defendant failed to pay sales tax of $754.34 and title transfer and license tag fees of at least $75.25 and $4.50, respectively. . . .  Because Plaintiff's allegations present no coverage issue and only raise questions regarding the amount of loss, the Court must agree with Defendant that appraisal is the appropriate (and contractually-mandated) mechanism for resolving this dispute."  *Id.* at 6.

As the above cases indicate, courts have repeatedly recognized that the type of challenge Plaintiff asserts here is in fact a dispute over the amount of money owed, and have rejected attempts in such cases to circumvent the application of an appraisal requirement. This case is no different, and therefore the case should be dismissed in favor of the requested appraisal.

In all events, while Plaintiff's CCC-related claims are subject to dismissal based on the appraisal requirement alone, they are also otherwise deficient.  Plaintiff alleges Defendant's use of CCC violates various provisions of Fla. Stat. Ann. § 626.9743, including because these provisions supposedly do not provide for the use of an electronic database or system, or one which uses "advertised prices" as opposed to sales prices or dealer quotes, and because by using CCC, Defendant does not properly document the basis for its calculations in the insureds' claim files.  (Compl., ¶¶ 29-34.)  Yet, Plaintiff points to nothing in the statute, or any Florida case law, which would preclude the use of CCC.  Nor does Plaintiff allege any facts, as opposed to bare and insufficient legal conclusions, suggesting that the use of the CCC system results in improper claim determinations.  Put simply, the Florida statutes do not mandate or forbid the use of any particular methodology to determine

actual cash value, so Plaintiff's per se challenge to Defendant's use of CCC is legally unfounded.

## II.     THE COURT SHOULD DISMISS PLAINTIFF'S SALVAGE CLAIMS.

Plaintiff's claims based on her theory that Defendant should have paid her for salvage value - Count I for declaratory relief and Count III for breach of contract -- also fail as a matter of law.  Defendant's payment obligations in the event of a total loss are governed by the Policy and Florida law.  Florida Statute Section 626.9743, entitled "Claim settlement practices relating to motor vehicle insurance," applies to the adjustment and settlement of motor vehicle insurance claims.  The statute states that where "the insurance policy provides for the adjustment and settlement of first-party motor vehicle total losses on the basis of actual cash value or replacement with another of like kind and quality, the insurer . . . may elect a cash settlement based upon the actual cost to purchase a comparable motor vehicle, including sales tax, if applicable pursuant to subsection (9)."   Fla. Stat. 626.9743(5)(a).  Plaintiff's Policy similarly provides that, in the event of a loss, Defendant "may pay for the loss in money."  Policy, Endorsement AO9018, p. 6.  The Policy further states "We may keep all or part of the property at an agreed or appraised value."  *Id.*  In addition, the Policy limits Defendant's liability to the actual cash value of damaged property, which may include a deduction for depreciation and physical condition.  *Id.*  Accordingly, nothing in the Policy or Florida law requires Defendant to compensate policyholders for the salvage value of their totaled vehicles.

In fact, the law is well settled that where an insurer pays the actual cash value of a totaled vehicle, the policyholder loses his right to whatever salvage remains, including any

right to recover the salvage value of the vehicle.  *See Allen v. American Security Insurance Company,* 53 N.C. App. 239, 242, 280 S.E.2d 471, 473 (1981) (in the case of the actual total loss where the insurance company pays the full pre-collision value of a vehicle, the vehicle's owner is expected to give up his right to the vehicle including his right to the proceeds from salvage of the vehicle); *Dwane v. West American Insurance Company,* 121 N.J. Super. 470, 477-78, 297 A.2d 865, 869 (1972) (where the insurer was required to settle a claim based upon a total loss due to its delay in having the vehicle repaired, the insurer was entitled to recover the car and secure the salvage, if any); *Kikendall v. American Progressive Insurance Company,* 457 So.2d 53, 58 (La. Ct. App.1984) (the insurer is "entitled to a credit for salvage value, if there is any.").

In *Langford v. Federated Guar. Mut. Ins. Co.*, 543 So. 2d 675, 677-78 (Ala. 1989), the Alabama Supreme Court explained that "when a collision claim is settled on the basis of a total loss, if an insured were entitled to receive the agreed actual cash value of the property plus retain the property (assuming the property was worth anything after the loss) then the insured would be receiving and the insurer would be paying to the insured more than the difference between the value of the vehicle before and after the loss.  In a claim settled on the basis of a total loss, this would amount to the insured's receiving and the company's paying more than the actual cash value, which would violate the provision that the limit of the insurer's liability is the actual cash value of the vehicle."  There, as here, the insured asserted a breach of contract claim on behalf of himself and a putative class based on the insurer's failure to pay policyholders the salvage value of their totaled vehicles.  The trial court

entered summary judgment in favor of the insurer, and the Alabama Supreme Court affirmed, stating:

> [I]t must be remembered that the insurer's liability is for "loss *to* the automobile," not loss *of* the use and enjoyment of the automobile, and that the loss shall not "exceed the actual cash value nor what it would then cost to repair or replace." Whatever salvage value the car has is not a "loss."

*Id*. at 678.   The Court explained that "when an insurer settles on the basis of total loss, whatever salvage may remain belongs to the insurer, and that if the owner desires to obtain that salvage, he must do so by purchasing it from the insurer or by allowing a deduction from the settlement of the value thereof."   *Id.* (citation and internal quotation omitted).

Notably, in *Bloomgarden* the court dismissed similar "salvage value" claims, based on policy language such as that here.   There, as here, the plaintiff alleged the defendant insurer, without authorization, forced him to transfer title to his vehicle and then failed to pay him for the salvage value of the vehicle in addition to its actual cash value.   The court stated:

> Here, the Policy authorizes Allstate to take ownership of a total loss vehicle:
>
> > We may pay for the loss in money, or may repair or replace the damaged or stolen property....  We may take all or part of the property at the agreed or appraised value.  We may settle any claim or loss either with you or the owner of the property.
>
> Policy (DE 19-2: 40) (emphasis added).   Bloomgarden's argument that the Policy does not permit Defendant to take the salvage vehicle is therefore without merit.   Furthermore, the Policy limits Allstate's liability to "the actual cash value of the property at the time of the loss, which may include a deduction for depreciation" (DE 19-2: 58).   Contrary to Bloomgarden's contention, neither the Policy nor Florida law requires Allstate to compensate policyholders for the salvage value of totaled vehicles, in addition to the Actual Cash Value.

*Bloomgarden*, 2019 WL 2245475, at *5.

In other words, based on the same type of policy language as that in Plaintiff's Policy here, the court held that the plaintiff was not entitled to recover salvage value in addition to the actual cash value.  As the *Bloomgarden* court further explained:

> Were Bloomgarden permitted to recover the $ 5,500 actual cash value (including deductible) for his vehicle and also to recover the $ 1,000 salvage value, he would recover a total of $ 6,500.  This amount would be more than the actual cash value of the vehicle -- an impermissible result under the Policy, which caps Allstate's liability at "the actual cash value of the property at the time of the loss, which may include a deduction for depreciation."  (DE 19-2: 58).

> Furthermore, allowing the insured to recover both the actual cash value of the property, as well as the salvage value, would directly conflict with the general principle that actual cash value policies are not meant to put an insured in a better position than he or she was before the loss.

2019 WL 2245475, at *6-7.  As in *Bloomgarden*  and the other cases cited above, Plaintiff's salvage claim here is legally infirm and should be dismissed.

## III.   PLAINTIFF'S BREACH OF CONTRACT CLAIM BASED ON DEFENDANT'S FAILURE TO PAY THE FEES PLAINTIFF SEEKS ALSO FAILS AS A MATTER OF LAW.

To state a valid cause of action for breach of contract, Plaintiff must plead:  (1) the existence of a contract, (2) a breach of the contract, and (3) damages resulting from the breach.  *Rollins, Inc. v. Butland*, 951 So. 2d 860, 876 (Fla. 2d DCA 2006).  Dismissal is warranted here because Plaintiff fails to allege any facts demonstrating any term of the applicable insurance contracts was breached.  *See, e.g., 111 Properties, Inc. v. Lassiter*, 605 So. 2d 123, 126 (Fla. 4th DCA 1992) ("With respect to 111 Properties' alleged breach of contract for failing to assist A & M in collecting the back taxes and back rent from the

tenant, we find that 111 Properties was not in breach. . . .   The contract between 111

Properties and A & M does not make 111 Properties' assistance in the collection of the

outstanding amounts a condition precedent to the enforcement of the contract.   111

Properties could have chosen, as it did, to pay the back taxes itself and, thereby, pay

$850,000.00 for the property.   Accordingly, 111 Properties did not breach the contract.");

*Striton Properties, Inc. v. City of Jacksonville Beach,* 605 So. 2d 164, 165 (Fla. 1st DCA

1992) ("count V was a breach of contract action based on a contract between appellant and

[the CRA]. . . .   The cause of action was based on the failure of the CRA to reimburse

appellant for certain expenses incurred as a result of performance of the contract.   The

contract (attached to the complaint) provided, however, that payment of expenses only

became due 60 days after a demand for payment with appropriate supporting documents had

been made.  The complaint failed to allege that such a demand had been made.").  And if the

applicable insurance policy did not provide coverage for Plaintiff's claim, there can be no

contractual breach.  *See, e.g., Garcia v. Fed. Ins. Co.*, No. 6:15-cv-1097-Orl-41GJK, 2017

WL 3706695, at *8 (M.D. Fla. Apr. 17, 2017) (ruling in favor of defendant insurer on breach

of contract claim:  "There is yet one final reason why the policy at issue does not provide

coverage for Plaintiff's claim -- as Defendant argues, the policy does not provide coverage

for a 'loss of value claim.'   Rather, the policy provides coverage for physical losses to

Plaintiff's residence or its contents if they are damaged, destroyed, or lost.  Plaintiff here is

attempting to collect insurance benefits for physical damage to the property -- despite the fact

that Plaintiff successfully sold the property to Sellari -- arguing that the damage caused

Sellari to cancel his original contract to purchase the home and lower his offer based on the

damage, resulting in harm to Plaintiff.  Plaintiff does not point to any provision of the policy that would cover this type of economic loss.").

Applying these principles, Defendant did not, as a matter of law, breach any term of the Policy by not paying the title and license plate transfer fees, registration service fees, dealer fees or air pollution control fees here because it is not obligated to do so under the Policy.  Accordingly, Plaintiff's breach of contract claim fails as a matter of law.

In fact, in *Schenck v. Windhaven Insurance Company*, No. 16-2018-CA-000023, at 5-6 (Fla. 4th Cir. Ct. May 17, 2019) (Exhibit D hereto), *mot. for reconsid. filed* (May 24, 2019), Judge Blazs dismissed a substantively identical breach of contract claim.  *Schenck* expressly held that title and license plate transfer fees were *not* required to be paid by the insurer, explaining:

> Nothing in the insurance contract entitles the Plaintiff to title transfer fees and license plate transfer fees.  While the "cost to replace" the property is synonymous with "actual cash value", the vehicle can be replaced without the payment of title transfer fees and license transfer fees, although it may not be legally operated.  Thus, under the policy, the actual cash value is the purchase price of [a] new vehicle, plus the payment of applicable sales tax.

*Id.* at pp. 5-6.

Consistent with the above analysis, there is a Florida statute governing "[c]laim settlement practices relating to motor vehicle insurance," which refers to sales tax but *not* to title and license plate transfer fees, registration service fees, dealer fees or air pollution control fees:

(5) When the insurance policy provides for the adjustment and settlement of first-party motor vehicle total losses on the basis of actual cash value or replacement with another of like kind and quality, the insurer shall use one of the following methods:

(a) The insurer may elect a cash settlement based upon the actual cost to purchase a comparable motor vehicle, <u>including sales tax, if applicable pursuant to subsection (9)</u>. . . .

* * *

(9) If sales tax will necessarily be incurred by a claimant upon replacement of a total loss or upon repair of a partial loss, <u>the insurer may defer payment of the sales tax unless and until the obligation has actually been incurred.</u>

(10) Nothing in this section shall be construed to authorize or preclude enforcement of policy provisions relating to settlement disputes.

Fla. Stat. Ann. § 626.9743 (emphasis added).

Unlike with sales tax, then, there is no statutory provision requiring an insurer to pay title, license plate transfer, registration service fees, air pollution control or dealer fees. Applicable here is the principle of "*expressio unius est exclusio alterius*" (*i.e.*, the expression of one thing implies the exclusion of another), which invalidates Plaintiff's liability theory as to the subject fees. *See, e.g., Moonlit Waters Apartments, Inc. v. Cauley,* 666 So. 2d 898, 900 (Fla. 1996) (explaining  and adopting this principle).  This principle applies in the insurance context, including to construction of insurance laws and insurance policies. *See, e.g., Jackson Nat'l Life Ins. Co. v. Lovallo*, 8 So. 3d 1242, 1243 n. 2 (Fla. 1st DCA 2009) (applying principle of *expressio unius est exclusio alterius* to interpret insurance laws); *Mason v. Florida Sheriffs' Self-Insurance Fund*, 699 So. 2d 268, 270 (Fla. 5th DCA 1997) (applying same principle to construction of insurance policy; "the policy provides coverage for a list of specific acts that does not include rape.  Since the inclusion of one thing implies

the exclusion of the other . . . the enumeration of particular covered acts should be construed to exclude all of those not expressly mentioned, including rape.") (citation omitted).

In short, nothing in the law or the Policy requires payment of the fees about which Plaintiff complains.  If Plaintiff's breach of contract theory were accepted, that would require the Court to rewrite the plain terms of the Policy, which is not allowed under Florida law. *See, e.g., Garcia v. Fed. Ins. Co.*, 969 So. 2d 288, 291 (Fla. 2007) (under Florida law insurance contracts must be "construed according to their plain meaning").  Here, the Policy refers to payment of loss and damage in terms of damage to the vehicle, not title and license plate transfer fees or the other fees Plaintiff seeks.  This Court should decline to rewrite the Policy's coverage grant beyond its plain meaning.

Nor can Plaintiff be heard to argue that the absence of a definition of "actual cash value" in the Policy should allow Plaintiff to expand coverage to include payment for the subject fees or to insert her own definition of what is covered.  "Under Florida law, if the terms of an insurance contract are clear and unambiguous, a court must interpret the contract in accordance with its plain meaning, and, unless an ambiguity exists, a court should not resort to outside evidence or the complex rules of construction to construe the contract. . . . [An] *ambiguity does not exist simply because a contract requires interpretation or fails to define a term*." *Key v. Allstate Ins. Co.*, 90 F.3d 1546, 1548-49 (11th Cir. 1996) (emphasis added); *Lancer Ins. Co. v. Northland Ins. Co.*, No. 6:14-cv-490-ORL-41-DAB, 2014 WL 12628536, at *2 (M.D. Fla. Oct. 15, 2014) (same principle).

The above analysis is further supported by a recent Illinois district court decision.  In *Sigler v. GEICO Casualty Co.*, No. 1:18-cv-01446-MMM-JEH, 2019 WL 2130137 (C.D. Ill.

16

May 15, 2019), the court found that "actual cash value" language in an insurance policy does

not include title or tag transfer fees:

> Nothing in the plain language of the policy can reasonably be construed as an express promise to insureds that they will be reimbursed for sales tax, title transfer fees, and tag transfer fees without first incurring such costs.  The Plaintiff is clearly entitled to the actual cash value of his vehicle.  The fact that actual cash value is defined, in part, as 'the replacement cost' in the policy, does not entitle him to a theoretical reimbursement.  The claim is simply too speculative.

*Id.,* at *3 (citation omitted).  Here too, the fees Plaintiff seeks are not covered under the

Policy.

Plaintiff alleges that ACV means replacement cost minus depreciation, and that the

fees she seeks are necessarily part of the replacement cost.. (Compl., ¶¶ 20, 35.)  As Plaintiff

must acknowledge, however, the Policy does not define "ACV," let alone define "replacement

cost," to include the fees Plaintiff seeks to recover.  In this regard, it is notable that courts

have treated ACV as a distinct concept from replacement cost.  *See, e.g., Gill v. Progressive

Direct Ins. Co.*, No. 2:06-CV-1151-MEF, 2008 WL 130774, at *4 (M.D. Ala. Jan. 10, 2008)

("While the policy does not define 'actual cash value', it is apparent . . . that 'actual cash

value' would include an adjustment for the actual physical condition, and would not be

merely equivalent to its replacement value[.]"); *Seckinger-Lee Co. v. Allstate Ins. Co.*, 32 F.

Supp. 2d 1348, 1358 (N.D. Ga. 1998) (stating the "policy is not ambiguous because it does

not define 'actual cash value'"; referring to actual cash value and replacement value as

separate amounts).  Here, of course, there is no indication in any event in the Policy that

either concept includes the fees about which Plaintiff complains.

But even if Plaintiff is correct that ACV means "replacement cost less depreciation," her liability theory still fails.  As noted, in *Schenck* Judge Blazs dismissed a similar breach of contract claim for this very reason, holding title and license plate transfer fees were *not* part of the cost to replace a vehicle.  The ruling in *Schenck* is well founded.  A plain reading of the applicable statutes indicates such fees are not part of the replacement cost, hence are not owed as part of an ACV payment.

With regard to title fees, an insured may obtain legal title to a replacement vehicle without first applying for a certificate of title and paying title fees.  The insured is considered the legal owner of the vehicle once the seller transfers a properly endorsed title to that person. *See, e.g.,* Fla. Stat. Ann. § 319.22(1)-(2).  After the transfer is accomplished, the statute separately requires that the buyer file an application for a new certificate of title and pay the requisite title fees within 30 days or risk being subject to additional late fees.  Fla. Stat. Ann. § 319.23(6)(a) ("In each case of transfer of a motor vehicle or mobile home, the application for a certificate of title, a corrected certificate, or an assignment or reassignment must be filed within 30 days after the delivery of the motor vehicle or after consummation of the sale of the mobile home to the purchaser.  An applicant must pay a fee of $20, in addition to all other fees and penalties required by law, for failing to file such application within the specified time. . . .").  Under Florida law, then, a person can purchase a vehicle, take possession and become the lawful owner without paying title transfer fees.  Purchasing a vehicle is one thing, but paying title fees is a separate transaction that could occur well after the vehicle purchase.

Similarly, license plate fees, which are due only for vehicles operated on Florida roads, are not part of the replacement cost of vehicle.  The registration fee statute allows 30 days for

compliance. Fla. Stat. Ann. § 320.02(13)(b). As with title transfer fees, since payment of registration fees can be deferred for at least 30 days those fees are not part of the "replacement cost" of a vehicle. Moreover, Section 320.02(1) exempts from registration "any motor vehicle that is not operated on the roads of [Florida] during the registration period." Fla. Stat. Ann. § 320.02(1) ("every owner or person in charge of a motor vehicle that is operated or driven on the roads of this state shall register the vehicle in this state. The owner or person in charge shall apply to the department or to its authorized agent for registration of each such vehicle on a form prescribed by the department. A registration is not required for any motor vehicle that is not operated on the roads of this state during the registration period.").

So, Florida law plainly does not require a person purchasing a vehicle to register it, and registration fees are thus separate from the costs that might be paid in acquiring a vehicle. And registration service fees are obviously incurred in connection with the license registration. The same is true of air pollution control fees. *See* Fla. Stat. Ann. § 320.03(6) ("A nonrefundable fee of $1 shall be charged on every license registration sold, transferred, or replaced. This fee must be deposited in the Air Pollution Control Trust Fund[.]"). Because, as set forth above, Florida law does not require a person purchasing a vehicle to register it, the registration service fees and air pollution control fees complained of here are also separate from the costs of acquiring a vehicle.

Moreover, dealer fees are completely discretionary. Dealers may charge some amount or no amount at all for such fees. While Florida law requires advertised prices of vehicles and binding contracts concerning the vehicle's selling price to include any

applicable dealer fees, s*ee* Fla. Stat. Ann. §§ 501.976(11), 501.976(16), there is no requirement that such fees be charged. As with the other fees at issue, there is thus absolutely nothing in Florida law requiring payment of dealer fees as part of an ACV payment.

To be sure, there have been cases that have ruled for insureds on the license and title fee issues, most notably *Sos v. State Farm*, 6:17-cv-890-Orl-40KRS, ECF No. 159 (M.D. Fla. Mar. 13, 2019) (Exhibit E hereto); *Roth v. GEICO Gen. Ins. Co*., No. 16-62942-CIV, 2018 WL 3412852 (S.D. Fla. June 14, 2018), *app filed* (Apr. 25, 2019) and *Jones v. Gov't Employees Ins. Co.*, No. 17CV1755, 2019 WL 3254207 (M.D. Fla. July 19, 2019). None of these cases, however, dealt with service, dealer or pollution control fees, and, as to license and title fees none of them considered the *expressio unius* analysis set forth above.

At the end of the day, under Plaintiff's approach of defining "replacement cost" to include fees reasonably likely to be paid to acquire and operate a vehicle, the term "replacement cost" of a vehicle could result in coverage being impermissibly expanded to include any and all types of costs and fees associated with a vehicle that go well beyond the cost of physical damage and actually replacing a vehicle. These could include, for example, the cost of gasoline or batteries needed to operate the vehicle, the cost of a roadside service membership while driving the vehicle, or toll fees necessarily incurred in the process of picking up or operating the vehicle. All these things could well be ultimately necessary in order to actually operate a vehicle, hence all could potentially constitute the "replacement cost" of a vehicle under Plaintiff's approach. Yet, these items, like the fees Plaintiff is demanding in this

lawsuit, are simply too far removed from the replacement process to be part of the covered ACV payment under the Policy, and are not required to be under Florida law, either.

## IV.   IN ALL EVENTS, PLAINTIFF'S LICENSE AND TITLE CLAIMS FAIL ON MOOTNESS GROUNDS.

While Defendant submits the above legal position renders any previous failure by it to pay the title and license plate fees as part of an ACV payment lawful, the fact is that given the proliferation of suits in Florida against other carriers relating to this issue Defendant determined to pay these fees, and applied this remediation process to Plaintiff, *prior* to the filing of this lawsuit.  Accordingly, there is no valid case or controversy here with respect to the license and title fee issue.

An actual controversy must exist at all stages of review, not merely at the time the complaint is filed.  *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997).  If an intervening circumstance deprives the plaintiff of a personal stake in the outcome of the lawsuit, at any point during litigation, the action can no longer proceed and must be dismissed as moot.  *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 72 (2013).  A claim becomes moot "when it no longer presents a live controversy with respect to which the court can give meaningful relief," *Ethredge v. Hall*, 996 F.2d 1173, 1175 (11th Cir. 1993), or "when the parties have no 'legally cognizable interest' in the outcome of the litigation," *Westmoreland v. Nat'l Trans. Safety Bd.*, 833 F.2d 1461, 1462-63 (11th Cir. 1987).

Applying these principles in *Peer v. Liberty Life Assurance Co.*, No. 9:17-CV-80281, 2018 WL 707752, at *3 (S.D. Fla. Feb. 5, 2018), *aff'd,* 758 Fed. App'x 882 (11th Cir. 2019),

the court found the plaintiff's claim, seeking an award for a waiver of premium benefit from

the defendant life insurer, moot:

> In her Motion, Plaintiff asks the Court to award her a Waiver of Premium.  It is undisputed that, after Plaintiff commenced this lawsuit (and after she filed her Motion), Liberty Life reversed its prior denial and approved Plaintiff's claim for a Waiver of Premium, granting her that Waiver and reinstating her coverage. Therefore, because Plaintiff has received the relief she sought and there is no further relief that the Court can award Plaintiff on her claim for an award of the Waiver of Premium benefit, the Court finds that Plaintiff's motion must be denied as moot.

*Id.*

Similarly, in *Harrison v. United Mine Workers of Am. 1974 Ben. Plan & Tr.*, 941

F.2d 1190, 1193 (11th Cir. 1991), the court found the claims of plaintiffs who had been paid

health and other benefits moot:

> As to those appellants who have submitted applications, the case is moot.  The Plan has approved all of the applications submitted by Black Diamond retirees or their eligible surviving family members and has paid all benefits in full.  There is no case or controversy between these appellants and the Plan.

*Id.*

So too here, Plaintiff's claims as to the title and license plate fees are moot because

there is no longer a live controversy as to which this Court can provide meaningful relief.

Defendant made the decision to change its adjustment practices to pay for the items

Plaintiff's Complaint alleges were wrongfully not paid in April, 2019, long before Plaintiff

even filed or served that Complaint.  *See* Declaration of Jeffrey S. Schlotter, attached hereto

as Exhibit F, ¶ 5.[2]  As a result of that decision, Defendant developed a process for reviewing total loss claims to ensure that title and license plate fees were paid.  (*Id.,* ¶ 6.)  The scope of the review included total loss claims for the 5-year period from January, 2014 to June, 2019, for claims where Florida was the policy state, license state, accident state or state where the vehicle was garaged.  In addition to sending letters to those insureds who had not been paid license plate or title transfer fees, Defendant sent checks for these amounts along with interest at a rate of 8%.  (*Id.,* ¶ 8.)  It should be noted that the 8% interest rate is well above the current interest rate on judgments in Florida, which is 6.77%.  https://www.myfloridacfo.com/Division/AA/LocalGovernments/Current.htm.  The first checks for payment of these fees, along with interest, were sent beginning on June 6, 2019.  (*Id.,* ¶ 7.)  Defendant completed this effort on July 2, 2019.  (*Id.,* ¶ 6.)  In addition, Defendant has committed to payment of these fees for all future claims.  (*Id.,* ¶ 4.)

In furtherance of this voluntary remediation process, on June 24, 2019 a letter was sent to Plaintiff advising she would be receiving a check for these fees in connection with her claim, as well as interest, and the check was mailed to Plaintiff separately.  (*Id.,* ¶ 9.)  Indeed, Plaintiff acknowledges in her Complaint (Compl., ¶ 43) that Defendant sent her the June 24, 2019 letter, but she complains it was sent to the wrong address.  Nonetheless, Plaintiff obviously received the letter, since she quotes it and attaches it to her Complaint.

---

[2] The attached Schlotter Declaration supports Defendant's position that this case is moot, hence subject to dismissal based on lack of subject matter jurisdiction.  Courts may consider documents outside the pleadings on a motion to dismiss that is premised on lack of subject matter jurisdiction.  *See, e.g., Happy Feet USA, Inc. v. Burch*, No. 6:09-CV-1903-ORL-KRS, 2010 WL 11626536, at *4 (M.D. Fla. Apr. 2, 2010).

In sum, Defendant has agreed to pay not only Plaintiff, but all the putative class members, for the subject fees, and added interest at a rate over a point higher than what is required by Florida law.  And that remediation process was decided on and had begun prior to this suit being filed, even with respect to this specific Plaintiff, so this is not a case of a defendant trying to "pick off" a class representative.  Rather, this is a case where Plaintiff's counsel demanded these fees be paid and Defendant told him they were in fact paid -- all prior to this litigation being filed.  As a result, there is simply no live case or controversy to litigate here with respect to the title and license plate fees, and on that basis too Plaintiff's claims as to those fees should be dismissed.

In *Sos v. State Farm Mut. Auto. Ins. Co.,* No. 17CV890, 2019 WL 3854761, at *2 (M.D. Fla. May 2, 2019), the court rejected State Farm's argument that a similar remediation process obviated the case, reasoning that State Farm began the remediation process "*after* the filing of the lawsuit*" in order "to circumvent the normal class action mechanisms," and that class members were still owed prejudgment interest, which State Farm's remediation did not include.  Here, by contrast, Defendant instituted the remediation process *before* the suit was filed, and its payments *included* interest -- and at a significantly higher rate than could be recovered in this lawsuit at that.

As to attorneys' fees and Plaintiff's claim that Defendant's payment was a "confession of judgment" (Compl., ¶ 43), given Defendant's voluntary remediation program which had begun and was applied and communicated to Plaintiff and her counsel well before this litigation was filed, there was certainly no need for Plaintiff's counsel to file this litigation in order to collect these benefits. Accordingly, there was no "confession of

judgment" (since payment was made prior to suit) and no attorneys' fees as to these claims are warranted (because there was no need to file suit).  *See, e.g., State Farm Fla. Ins. Co. v. Lorenzo,* 969 So. 2d 393, 398 (Fla. 5th DCA. 2007) (stating courts do not award fees where the insureds were not forced to sue to receive benefits; noting that doing so "would encourage unnecessary litigation by rewarding a race to the courthouse for attorney's fees even where the insurer was complying with its obligations under the policy."); *Johnson v. Omega Ins. Co.,* 200 So. 3d 1207, 1219 (Fla. 2016) ("Section 627.428 provides that an incorrect denial of benefits, followed by a judgment or its equivalent of payment in favor of the insured, is sufficient for an insured to recover attorney's fees.  Extensive case law further provides that an insurer's concession that the insured was entitled to benefits *after* a legal action has been initiated is the functional equivalent of a confession of judgment.") (emphasis added).

## CONCLUSION

For all the foregoing reasons, Defendant respectfully requests this Court enter an order dismissing this action.

> **BAKER, DONELSON, BEARMAN,**
> **CALDWELL & BERKOWITZ, PC**
> SunTrust Center
> 200 South Orange Avenue, Suite 2900
> Orlando, FL  32801
> Phone: 407-422-6600
> Fax: 407-841-0325
> *Counsel for Defendant*
>
> By:  /s/ *Kyle A. Diamantas*
>     Kyle A. Diamantas, Esquire
>     Florida Bar No. 106916
>     *kdiamantas@bakerdonelson.com*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 9, 2019, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to counsel of record.

/s/ *Kyle A. Diamantas*
Kyle A. Diamantas